IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| BEVERLY HICKERSON, | ) | CASE NO. 3:20-cv-01678 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Beverly Hickerson ("Plaintiff" or "Ms. Hickerson") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

Ms. Hickerson protectively filed her application for DIB on December 10, 2017, and filed her application for SSI on May 1, 2018. (Tr. 18, 74, 97, 98, 175-176, 177-187.) She asserted a disability onset date of June 28, 2017 in both applications. (Tr. 18, 175, 179.) She alleged that she was disabled due to: coronary heart disease; venous reflex disease; back, hip, leg, knee, and feet issues; upper hernia; arthritis; and spurs. (Tr. 64-65, 76, 99, 107, 110.) Her application was denied at the initial level (Tr. 99-101) and upon reconsideration (Tr. 107-109, 110-111). She

then requested a hearing.  (Tr. 112-113, 114-116.)  A hearing was held before an Administrative Law Judge ("ALJ") on May 21, 2019.  (Tr. 33-63.)

On August 22, 2019, the ALJ issued an unfavorable decision, finding that Ms. Hickerson had not been under a disability within the meaning of the Social Security Act from June 28, 2017 through the date of the decision.  (Tr. 15-32.)  She requested review of the ALJ's decision by the Appeals Council.  (Tr. 172-174.)  On June 3, 2020, the Appeals Council denied Ms. Hickerson's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).

## II. Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Hickerson was born in 1967.  (Tr. 25.)  She was 49 years old on the alleged disability onset date, and 51 years old at the time of the hearing.  (Tr. 25, 41-42.)  She completed the twelfth grade.  (Tr. 42.)  Ms. Hickerson worked as an assistant manager at Sunoco for five years through June 2017.  (Tr. 42, 44-48.)  After that date, her only paid work was for four days in February or March of 2019.  (Tr. 42.)  She said she could not handle the job because the job required a lot of heavy lifting, climbing stairs, and standing.  (*Id.*)

### B.    Medical Evidence

In December 2013, Ms. Hickerson received treatment at the emergency room for cardiac-related issues and complaints of swelling in her lower extremities, and underwent a cardiac catherization.  (Tr. 2057, 2062.)  The following year, in November 2014, Hickerson presented to the emergency room with complaints of swelling in her legs, as well as itching in her right leg. (Tr. 2073.)  A physical examination showed bilateral lower extremity edema, greater on the right than left in the calves.  (Tr. 2076.)  The right lateral calf was mildly tender to palpation.  (Tr.

2076.)  An ultrasound of the right lower extremity was ordered, but revealed no evidence of

DVT (deep vein thrombosis).  (Tr. 2078.)

In December 2016, Ms. Hickerson slipped and fell on ice at work, injuring her right

shoulder, hip, low back, and lower leg.  (Tr. 440, 451, 455, 1006.)  She was seen in the

emergency room, and was given Ultram and a walker and placed on "light duty, sedentary work

only."  (Tr. 440, 454.)  She continued with treatment for her injuries.  (Tr. 440, 1176.)  During a

follow-up visit on January 3, 2017, Ms. Hickerson relayed that she was doing much better and

had been able to perform her regular work without problems.  (Tr. 1176.)  She wanted "to

continue full duty" at work.  (*Id.*)  She reported achiness over her right hip and some discomfort

in her right shoulder, but no problems in her lower leg.  (*Id.*)   On January 3, 2017, a "Discharge

and Physicians Report of Work Ability" form was completed regarding Ms. Hickerson's

December 19, 2016 work injury.  (Tr. 1168-1169.)  In that form, it was noted that Ms. Hickerson

did not "have any physical or health restrictions related to allowed conditions in the claim."  (Tr.

1168.)

Ms. Hickerson attended a family practice office visit on April 26, 2017 for follow up

regarding hypertension and hyperlipidemia.  (Tr. 663.)  On physical examination, her gait and

station were normal and no edema was noted in the lower extremities.  (Tr. 666.)  She continued

to work until June 28, 2017, her alleged onset date.  (Tr. 213.)

On June 15, 2017, shortly before she stopped working, Ms. Hickerson had a bilateral

venous duplex ultrasound.  (Tr. 734.)  At a follow up with Jeremy Heffner, M.D. of Midwest

Surgical Specialists on June 23, 2017, it was noted that the ultrasound showed no evidence of

DVT or superficial venous thrombus, but did show evidence of deep system venous insufficiency

and superficial venous insufficiency in the greater saphenous vein.  (*Id.*)  Dr. Heffner indicated

that the exam results satisfied the medically accepted standards for vein ablation, and that Ms. Hickerson was therefore a candidate for radio frequency ablation of the right greater saphenous vein, right perforator vein, and left greater saphenous vein.  (*Id.*)  Physical examination revealed spider veins with 2+ edema bilaterally.  (Tr. 734-735.)  She was assessed with varicose veins of bilateral lower extremities with pain.  (Tr. 735.)

In July and October 2017, Ms. Hickerson underwent vein ablation procedures in her lower extremities.  (Tr. 774-780.)  During an appointment at Lima Memorial Heart Institute of Northwest Ohio with Pamela Gardner, D.O. on August 25, 2017, Ms. Hickerson relayed that she was having some swelling in her legs, but that it had improved with her vein surgeries.  (Tr. 312.)  No edema or varicose veins were observed on physical examination.  (*Id.*)

On September 15, 2017, Ms. Hickerson attended an appointment at Lima Memorial, Midwest Surgical Specialists, with Natalie Long, PA-C, to review results of a venous ultrasound conducted following the ablation procedures.  (Tr. 723.)  Ms. Long noted that the ultrasound showed "successful closure of treated vessels as well as no evidence of DVT bilaterally."  (Tr. 723-724.)  However, it was noted that Ms. Hickerson was continuing to have symptoms, reporting that the "pain from spider and reticular veins [was] drastically impacting her quality of life." (Tr. 724.)  Physical examination findings included 1+ edema bilaterally.  (*Id.*)  Ms. Hickerson was again assessed with varicose veins of the bilateral lower extremities with pain. (Tr. 723.)  Sclerotherapy to Ms. Hickerson's bulging reticular veins was recommended.  (*Id.*)  The record does not reflect whether Ms. Hickerson underwent the recommended therapy.

During an October 2017 family practice visit with Sheldon Wical, D.O., a review of systems was negative for lower extremity swelling, muscle pain, or joint pain.  (Tr. 657, 659.)  Ms. Hickerson's gait and station were normal on physical examination, and no edema was noted

in her lower extremities.  (Tr. 661.)  Dr. Wical observed that the symptoms associated with her hypertension and hyperlipidemia were controlled with the current management plan.  (*Id.*)  She was instructed to continue on her current medications for hypertension and hyperlipidemia, and follow up for re-evaluation in six months.  (*Id.*)  A venous doppler ultrasound of the bilateral lower extremities was also performed in October 2017.  (Tr. 770-773.)  The ultrasound showed no deep vein thrombosis, thrombosed right anterior thigh pain, bilateral accessory saphenous veins, and bilateral perforator veins.  (Tr. 773.)

In a written statement completed on January 5, 2018, Dr. Heffner reported last seeing Ms. Hickerson on November 6, 2017.  (Tr. 711, 712.)  He noted Ms. Hickerson's diagnosis of varicose veins of bilateral lower extremities with pain, and identified her symptoms as including pain in the bilateral extremities, heaviness, tired/fatigue bilateral lower extremities, itching, burning, swelling, cramping, and restless leg syndrome.  (Tr. 712.)  When asked about any surgical or clinical interventions, Dr. Heffner indicated that Ms. Hickerson "had VNUS completed," with "[n]o further plan of treatment [at] this time."  (*Id.*)

On initial review of Ms. Hickerson's application in December 2017, state agency reviewing consultant Lynne Torello, M.D., completed a physical RFC assessment on February 13, 2018, opining that Ms. Hickerson was limited to light exertional work with the following additional limitations:

- never climb ladders, ropes, or scaffolds;

- occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl.

(Tr. 70-71.)

On February 28, 2018, Ms. Hickerson attended a follow-up cardiac appointment with Dr. Gardner and reported occasional swelling in her ankles.  (Tr. 839.)  She denied leg pain while

walking but reported edema. (Tr. 840.) On physical examination, no edema was observed. (*Id.*) An echocardiogram was ordered. (*Id.*) The results of the echocardiogram and stress test performed in November 2018 were unremarkable. (Tr. 801-802, 806.)

At the reconsideration review of Ms. Hickerson's applications for DIB and SSI, state agency reviewing consultant, Diane Manos, M.D., completed a physical RFC assessment on May 23, 2018, affirming Dr. Torello's opinions. (*Compare* Tr. 70-71 *with* Tr. 92-94.)

In February 2019, Ms. Hickerson presented to the emergency room for treatment after missing a step and twisting her left foot. (Tr. 1519.) She complained of pain in her right big toe and left foot and ankle. (*Id.*) She reported that she did not immediately seek treatment for her injury because she had been watching her grandchildren during the day. (Tr. 1523.) It was determined that Ms. Hickerson broke her right big toe and sprained her left ankle. (Tr. 788, 1524.) She was provided a surgical shoe, instructed to follow up with podiatry for the fracture, and discharged home in stable condition. (Tr. 788, 1524-25.) She followed up with podiatry that month, but relayed that she had not been wearing the surgical shoe because it was "too sloppy." (Tr. 788.) She reported that the pain in her left ankle was "still just as bad," while her right toe still hurt but was getting better. (*Id.*) On examination, Ms. Hickerson's lower extremities had normal strength, sensation, and reflexes. (Tr. 790.) She was advised to continue to wear the surgical shoe, and was provided with a brace for her left ankle. (Tr. 791.)

During a cardiac appointment on March 12, 2019, Ms. Hickerson reported doing well as far as her cardiac issues, but that she had "tried working at Dollar General but it was too much work with lifting and moving things." (Tr. 793.) Her main complaint was noted to be joint pain, with additional complaints of edema in both legs. (Tr. 793.) Her physical examination noted no edema and no varicose veins. (Tr. 794.) Ms. Hickerson was assessed with essential

6

hypertension, systolic heart failure, and hyperlipidemia.  *Id.*  Dr. Gardner noted that Ms. Hickerson was doing well "[c]ardiac wise," continued Hickerson's medications, and indicated that she would see Hickerson in a year or sooner if necessary.  (Tr. 795.)

On April 2, 2019, Ms. Hickerson's family medical provider Dr. Wical ordered a lumbar spine x-ray based on a clinical history of back pain with radiculopathy.  (Tr. 1586.)  The x-ray showed mild degenerative changes, evidence of moderate narrowing of the L4-L5 intervertebral space indicative of degenerative disk disease at that level, and no acute osseous abnormalities.  (*Id.*)  On April 4, 2019, Dr. Wical ordered ultrasound venous duplex imaging of her lower extremities based on her clinical history of bilateral radiating leg pain.  (Tr. 1632-1633.)   The ultrasound technician noted a reported history of lower leg pain and swelling, pain radiating from the hips down, itching skin, claudication, and tingling in the lower legs.  (Tr. 1632.)  The imaging showed "no evidence for fresh deep venous thrombosis" (Tr. 1632), and "[n]o gross obvious high grade stenosis . . . readily apparent on either side" (Tr. 1633).   On one of the ultrasounds, it was noted that there was an inability to compress adequately at multiple levels especially in the thigh, which "may be due to arteriosclerotic vascular calcifications," and further noted that "correlation with CT angiography may be considered" if indicated.  (Tr. 1633.)

On May 9, 2019, two weeks prior to her disability hearing, Ms. Hickerson presented to Orthopedic Institute of Ohio with complaints of low back and bilateral leg pain.  (Tr. 2141.)  She saw Alec Curry, PA-C, and relayed that the prior vein procedures for her legs provided "mild brief relief," but that she had more numbness in her legs since those procedures.  (*Id.*)  On examination, there was noted swelling in the ankles, but findings were otherwise unremarkable.  (Tr. 2142.)  She was assessed with radiculopathy of the lumbar region, other intervertebral disc

degeneration of the lumbar region, and acute bilateral lower back pain without sciatica.  (*Id.*)
Recommendations included physical therapy and tramadol for better pain control.  (*Id.*)

Ms. Hickerson next presented to the Vein Care Center of Lima on May 14, 2019 for an
initial evaluation regarding her bilateral lower extremity complaints, including aching, being
awakened at night, burning, cramping, fatigue, heaviness, itching and swelling in both the right
and left lower extremities.  (Tr. 2135.)  Manu Aggarwal, M.D. was the treating provider.  (*Id.*)
Ms. Hickerson reported that her symptoms were worse with prolonged standing, walking,
exercise, and prolonged sitting, and that her symptoms were improved with leg elevation.  (*Id.*)
Ms. Hickerson reported treating her leg problems conservatively with compression stockings, leg
elevation, exercise, weight reduction, avoidance of prolonged standing or walking, and
Potassium medications.  (*Id.*)  She also reported that the conservative treatments had not resulted
in significant improvement in her symptoms.  (*Id.*)  Her physical examination revealed moderate
edema above the ankles and below the knees.  (Tr. 2137.  It was noted that her venous disease in
the bilateral lower extremities was "primary," but her muscle tone and strength were appropriate,
and her gait was normal.  (Tr. 2137-2138.)  She was diagnosed with lymphedema, not elsewhere
classified, and pain in legs bilaterally.  (Tr. 2139.)

Dr. Aggarwal's recommendations included: compression stockings; elevation of her legs
while sitting; avoidance of crossing legs, wearing high heels, and prolonged sitting and standing;
frequent position changes to encourage blood flow; and moving around at least every 30
minutes.  (*Id.*)  It was also recommended that Ms. Hickerson walk for exercise.  (*Id.*)  Ms.
Hickerson was referred to the lymphedema clinic and instructed to follow up with Dr. Aggarwal
in two months.  (*Id.*)  An ultrasound performed on that same date showed no evidence of DVT.
(Tr. 2127-2129.)

C.      **Hearing Testimony**

1.      **Plaintiff's Testimony**

At her May 21, 2019 hearing, Ms. Hickerson testified in response to questioning by the ALJ and her representative.  (Tr. 37, 41-57.)  With respect to her leg problems, Ms. Hickerson testified that she had received treatment, but was still having problems with her legs.  (Tr. 53-54).  Following her vein procedures, she testified that she told her treatment provider in February or March of 2018 that her legs were still hurting, burning, and swelling, but was told there was nothing further that they could do for her.  (Tr. 54.)  She said she elevated her legs to relieve her symptoms, explaining "I do elevation with my heart" about five or six time each day.  (Tr. 54, 58.)  She also reported trying compression socks, but did not feel that they helped, stating that they made the swelling worse.  (Tr. 54.)  She reported taking Lasix for the swelling in her legs, but did not think that it helped because her legs were still swelling.  (Tr. 57.)  She also reported trying Hydrochlorothiazide.  (*Id.*)  She testified to recent treatment with new provider Dr. Aggarwal in the week before her hearing, stating that Dr. Aggarwal had recommended lymphedema massage.  (Tr. 52-54.)  At the time of the hearing, Ms. Hickerson reported that she had not yet scheduled the recommended massage.  (Tr. 53.)

With respect to her back impairment, Ms. Hickerson relayed that she had problems across her entire lower back.  (Tr. 50-51.)  Her back pain was described as constant, and started within a year prior to the hearing.  (Tr. 51.)  Ms. Hickerson reported that she was scheduled to start physical therapy for her back and her treatment providers wanted her to have an MRI.  (*Id.*)  When asked about problems with standing, she stated "[i]t - - gets to my back," and estimated she would be able to stand for about fifteen minutes before starting to have problems with her back.  (Tr. 54.)  When asked about problems with walking, she responded "I have to use my

cane, and that's something that I can lean on and that, because it just feels like I'm going to collapse with the pressure on my back and that." (Tr. 54-55.)  The ALJ asked, "So it's your back that's causing you the problems in the standing and walking?" (Tr. 55.)  Ms. Hickerson responded: "Yeah." (*Id.*)  She testified that the cane was not prescribed. (*Id.*)

The ALJ inquired into whether Ms. Hickerson felt that her weight prevented her from doing things. (Tr. 55.)  Ms. Hickerson replied that she had tried to lose weight, but she just could not lose it. (*Id.*)  She indicated that Dr. Aggarwal thought that part of Ms. Hickerson's weight problem was the fact that she was retaining fluid. (*Id.*)  Ms. Hickerson also reported that she was not able to exercise. (*Id.*)  Her heart condition was reported to be stable. (Tr. 55-56.)

With respect to medications, Ms. Hickerson reported a recent prescription for tramadol for pain from her back specialist. (Tr. 56.)  She was planning on starting it the evening after her hearing. (*Id.*)  She also reported being prescribed Trazadone to help her sleep. (*Id.*)

Ms. Hickerson testified that she lived with her husband, who received social security disability due to a mental health impairment. (Tr. 43.)  Although they lived in a two-story home, Ms. Hickerson testified she was unable to make it up the stairs. (Tr. 43-44.)  She reported she had not been upstairs in their home for about a year, and that everything was on the first floor. (Tr. 44.)  Ms. Hickerson reported having fallen on more than one occasion. (Tr. 56-57.)  She indicated that her most recent falls had occurred in February and March of 2019. (*Id.*)

With respect to daily activities, she reported that she and her husband both helped with the household chores and cooking. (Tr. 49.)  While Ms. Hickerson did do grocery shopping, she reported she had to use a shopping cart so that she had something to lean on when she was walking or picking up groceries. (Tr. 50.)  She stated that she had to start using a shopping cart about a year prior to the hearing. (*Id.*)  Ms. Hickerson reported only sleeping for about four

10

hours at night because she tossed and turned and could not fall back asleep. (Tr. 49.) On a typical day, Ms. Hickerson reported sitting in her chair with her feet up and reading or watching television. (Tr. 49-50.) She also enjoyed coloring. (Tr. 49.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing (Tr. 58-63) and classified Ms. Hickerson's past work as that of assistant manager, a skilled, light exertional job that Ms. Hickerson performed at the medium level (Tr. 59-60).

For her first hypothetical, the ALJ asked the VE to consider:

> an individual who could perform less than a full range of sedentary -- I'm sorry -- full range of light work. This individual can never climb ladders, ropes, or scaffolds, and can occasionally climb ramps and stairs, balance, crouch, kneel, stoop, and crawl. This individual must have the ability to alternate between sitting and standing at their option every 30 minutes for one to two minutes, so long as this individual is not off task or has to leave the vicinity of the workstation. This individual can occasionally walk on uneven terrain or work around unprotected heights and could frequently operate foot controls with bilateral lower extremities.

(Tr. 60.)

Considering that hypothetical, the ALJ asked the VE whether the individual could perform the identified past work. (*Id.*) The VE indicated that the described individual would not be able to perform Ms. Hickerson's past work because that position usually does not allow for an alternating sitting and standing limitation as contained in the hypothetical. (Tr. 60-61.) However, the VE indicated that there would be unskilled positions in the national economy that the described individual could perform, including office helper, mail sorter, and routing clerk. (Tr. 61.) The VE provided job incidence data for each of the identified jobs. (*Id.*)

For her second hypothetical, the ALJ asked the VE whether his answer to the first hypothetical would change if the individual described in the first hypothetical would also need to occasionally elevate the lower extremities six inches throughout the workday. (Tr. 61.) The VE

indicated that elevating legs at six inches would not impact the availability of the jobs identified in response to the first hypothetical, adding that: "Generally speaking, it becomes an issue when you're elevating your legs to 90 degrees and higher based on my experience, as 90 degrees or higher pulls you away from your desk or your bench assembly and does not allow you to perform your job in [an] efficient manner."  (*Id.*)

The ALJ then asked the VE to address work tolerances for regular breaks, absences, etc. (Tr. 62.)  The VE explained that "employers generally allow for about 10 to 12 unscheduled absences per year, so on [sic] average of about one unscheduled absence per month."  (*Id.*) Absenteeism was defined as "missing the entire day, coming in late, leaving early, or any combination of those three."  (*Id.*)  With respect to off-task behavior, the VE stated that "employers will generally allow an employee to be off task up to 15% of the workday outside of the regularly scheduled work breaks," i.e., "a 15-minute break in the morning and afternoon, and 30 to 60-minute lunch break."  (*Id.*)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

## IV. The ALJ's Decision

In her August 22, 2019, decision the ALJ made the following findings:[2]

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.  (Tr. 20.)

2.  The claimant has not engaged in substantial gainful activity since June 28, 2017, the alleged onset date.  (Tr. 20-21.)

3.  The claimant has the following severe impairments: obesity, bilateral varicose veins status-post ablation and venous insufficiency in the right lower extremity; systolic heart failure; and lumbar degenerative disc disease.  (Tr. 21.)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 21-22.)

5.  The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except she can never climb ladders, ropes, or scaffolds; she can occasionally climb ramps and stairs, balance, crouch, kneel, stoop, and crawl; she must have the ability to alternate between sitting and standing, at her option, every 30 minutes for 1-2 minutes so long as she is not off-task or has to leave the vicinity of the workstation; she must be able to occasionally elevate the lower extremities 6 inches throughout the workday; she can occasionally walk on uneven terrain or work around unprotected heights; and she can frequently operate foot controls with the bilateral lower extremities.  (Tr. 22-24.)

6.  The claimant is unable to perform any past relevant work.  (Tr. 24-25.)

7.  The claimant was born in 1967 and was 49 years old, defined as a younger individual age 18-49, on the alleged disability onset date, and she subsequently changed age category to closely approaching advanced age. (Tr. 25.)

8.  The claimant has at least a high school education and is able to communicate in English.  (Tr. 25.)

9.  Transferability of job skills is not material to the determination of disability.  (Tr. 25.)

---

[2] The ALJ's findings are summarized.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including office helper, mail sorter, and routing clerk. (Tr. 25-26.)

Based on the foregoing, the ALJ determined that Ms. Hickerson had not been under a disability, as defined in the Social Security Act, from June 28, 2017, through the date of the decision. (Tr. 26.)

## V. Plaintiff's Arguments

Ms. Hickerson argues that the ALJ erred in her evaluation of the medical record and unreasonably assessed Ms. Hickerson's RFC and the severity of Ms. Hickerson's symptoms, and did not satisfy her burden at Step Five. (ECF Doc. 16, pp. 7-11; ECF Doc. 20.)

## VI. Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

15

(6th Cir. 1989)); *see also Blakely*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

      "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakely*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

      Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004))); *see also Rabbers*, 582 F.3d 647, 654 ("Generally, … we review decisions of administrative agencies for harmless error.").

A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011), *report and recommendation adopted sub nom, McHugh v. Soc. Sec. Com'r*, 1:10-cv-734, 2011 WL 6122758 (S.D. Ohio Dec. 8, 2011); *Gilliam v. Astrue*, No. 2:10-cv-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010), *report and recommendation adopted*, 1:09-cv-1982, 2010 WL 2929550 (N.D. Ohio July 27, 2010).

**B.      Single Assignment of Error: Whether the ALJ Erred in Evaluating Medical Record, RFC, or Symptom Severity, or Failed to Carry Her Step Five Burden.**

In her issue presented, Ms. Hickerson argues that the ALJ erred in evaluating the medical record, the RFC, and the severity of her symptoms, and failed to carry the Commissioner's burden at Step Five of the sequential analysis.  (ECF Doc. 16, p. 7.)  Her more specific arguments are addressed in turn below.

**1.      Whether RFC Limiting Plaintiff to Light Work is Supported by Substantial Evidence, Despite Typographical Error and Factual Misstatement.**

Ms. Hickerson argues that the ALJ erred in finding that she could perform light exertion work despite her lower extremity impairments.  (ECF Doc. 16 p. 7.)  Specifically, she argues that the ALJ erred in stating that her symptoms had "greatly improved," while citing to a non-existent exhibit page in support. (*Id.* (citing Tr. 23).)  She contends that the record does not show great improvement in her symptoms, pointing to symptoms outlined in the form completed by Dr. Heffner in January 2018 (Tr. 712), Dr. Heffner's treatment notes from 2016-17 (Tr. 715-780), and symptoms she reported to new providers in visits to establish care shortly before her

17

disability hearing (Tr. 2135-43).  (ECF Doc. 16 pp. 7-8.)  She also asserts that the ALJ

mischaracterized her testimony by saying she testified her problems with walking and standing

*were not* caused by lower extremity issues, when she had actually testified that those problems

*were* caused by her back (without reference to her lower extremities).  (ECF Doc. 16 p. 9.)

The Commissioner responds that the ALJ "reasonably found that Plaintiff could perform

a reduced range of light work given her improvement with vein treatment, medication and other

conservative and routine care," and appropriately addressed lower extremity impairments with

RFC limitations allowing her to alternate positions and elevate her legs.  (ECF Doc. 19 p. 5.)

In determining whether the decision is supported by substantial evidence, it must be

determined whether the decision sets forth "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030.  Any findings of fact that

are supported by substantial evidence are conclusive.  *McClanahan*, 474 F.3d at 833.  However,

a decision will not be upheld if the ALJ's reasoning does not "build an accurate and logical

bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

In this case, Ms. Hickerson has accurately pointed out several errors in the ALJ's

discussion of her lower extremity limitations.  First, it is clear that the ALJ's citation to page 11

of Exhibit 15F is an error (Tr. 23), as that exhibit is only three pages long (Tr. 2141-43).

Plaintiff offers argument based on the assumption that the ALJ may have intended to refer to

page 1 of Exhibit 15F.  (ECF Doc. 16 p. 7.)  An independent review of the Exhibits does not

provide any clarity as to what record or page the ALJ intended to reference, whether it was 15F

page 1, 5F page 11, or some other document in the record.  Second, the ALJ's statement that "the

claimant testified that her problems with walking and standing are not caused by her lower

extremity issues" (Tr. 23) does not appear to accurately describe the relevant testimony.  As

18

outlined in Section II.C.1. *supra*, Ms. Hickerson did testify that her back problems were the cause of her difficulties in standing and walking, but did not go so far as to state that her lower extremity issues did not also contribute. (Tr. 54-55.)

While Ms. Hickerson has accurately identified errors in the drafting of the decision, the mere presence of a typographical or factual error does not require reversal.  A typographical or factual mistake may be considered harmless – and thus not a basis for reversal – where the ALJ's assessments and decision as a whole are supported by substantial evidence.  *See Ulman v. Comm'r of Soc. Sec*. 693 F.3d 709, 712-13 (6th Cir. 2012) (noting ALJ's factual mistake was harmless when the ALJ's credibility finding was based on a lengthy analysis of evidence to support the credibility determination); *Cameron v. Comm'r of Soc. Sec.*, No. 1:15-cv-169-HSM-SKL, 2016 WL 11431681, at *7 (E.D. Tenn. Apr. 12, 2016) (finding typographical error harmless and not a basis for reversal where ALJ's decision and assessment of credibility was supported by substantial evidence), *report and recommendation adopted sub nom. Cameron v. Colvin*, No. 1:15-cv-169, 2016 WL 4094884 (E.D. Tenn. Aug. 2, 2016).  This is because the evidence in the record must be "taken as a whole" in determining whether the Commissioner's findings are supported by substantial evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993) (citing *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir.1980)).  The analysis would be different, of course, where the relevant finding was based "solely or primarily on the factual error identified…"  *Ulman,* 693 F.3d at 713.

In this case, the two errors are found within a greater discussion of symptoms and treatments relating to Ms. Hickerson's cardiac and venous impairments.  The ALJ found that Ms. Hickerson's "treatment records indicate that her heart failure and venous insufficiency impose

some functional limitations but do not support the severity of her allegations" (Tr. 23), and

explained further:

> Although the claimant was diagnosed with congestive heart failure in December 2013 and reported some intermittent chest pain during the period at issue, her [sic] the claimant had an ejection fraction of 55 percent on March 4, 2016; 60 percent on November 19, 2018; and 60 to 69 percent on November 19, 2018 (1F/27; 8F/5, 9, 14; 12F/218). Furthermore, the claimant testified that she did not have any current cardiac issues (Hearing Testimony). <u>Additionally, although the claimant received treatment for bilateral lower extremity venous insufficiency in 2017 and continues to experience lower extremity edema, her treatment records indicate that treatment greatly improved her symptoms (15F/11).</u> The claimant's bilateral lower extremity venous duplex ultrasound showed deep system venous insufficiency and superficial venous insufficiency in the greater saphenous vein bilaterally and June 23, 2017 examination documented swelling bilaterally (5F/27, 43, 49-50). The claimant had radiofrequency ablation of her bilateral greater saphenous veins in July and October 2017 and her follow up ultrasound documented successful closure of the treated vessels (5F/20, 54, 67-68, 70-73). The claimant's August 25, 2017 examination noted that the claimant's leg swelling had improved since her vein surgeries and she did not have any edema or varicose veins on exam (1F/23). The claimant's October 30, 2017 ultrasound showed thrombosed accessory saphenous and left perforator veins but her November 2017 treatment records noted that the claimant's treatment for venous insufficiency had been completed with no plans for further treatment (5F/5, 64). The claimant's March 12, 2019 examination documented no varicose veins and no edema and her April 4, 2019 ultrasound indicated that there was no high grade stenosis in either leg (8F/1; 12F/146; Hearing Testimony). <u>Furthermore, the claimant testified that her problems with walking and standing are not caused by her lower extremity issues (Hearing Testimony)</u>. These treatment records indicate that the claimant can perform a range of light work that allows the claimant to elevate her legs to treat her lower extremity edema and provide her with a sit/stand option.

> (Tr. 23 (emphasis added).)

In the context of this discussion, the question becomes whether the ALJ's ultimate findings

regarding Ms. Hickerson's limitations are supported by substantial evidence despite the errors, or

conversely if the errors cause her reasoning to fail to "build an accurate and logical bridge

between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

> **(i)      ALJ Finding That Symptoms Improved, With Erroneous Citation**

As to the statement that "treatment records indicate that treatment greatly improved her symptoms," with an erroneous citation to a nonexistent exhibit page, Ms. Hickerson points out that the three-page medical record in 15F reflects that she had complained of significant bilateral leg pain at her May 9, 2019 treatment visit to establish care with the Orthopedic Institute of Ohio, telling Alec Curry PA-C that her prior treatments had only resulted in "mild brief relief." (ECF Doc. 16 p. 7 (citing Tr. 2141).)  As stated previously, due to a clear typographical error, it is not possible to determine with any confidence what specific record the ALJ intended to reference in support of her statement that symptoms had greatly improved with treatment.  The question then becomes whether the ALJ's reasoning and findings as a whole are supported by substantial evidence, with an accurate and logical bridge between the evidence and the result.

Because Ms. Hickerson focuses her argument on her subjective complaints regarding symptoms (ECF Doc. 16 pp. 7-8), that is the standard addressed here.  First, it is clear that "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see also Alexander v. Kijakazi*, 1:20-cv-1549, 2021 WL 4459700, at *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476)); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 2017 WL 5180304, at *2 (Oct. 25, 2017)[3] (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).  "An ALJ's findings based on the credibility of the applicant are to be accorded

---

[3] SSR 16-3p is applicable to determinations made on or before March 28, 2016.  2017 WL 5180304, at *13, n. 27. On October 25, 2017, the SSA republished SSR 16-3p, indicating that it was republished "with a revision detailing how we apply the SSR as it relates to the applicable date. We changed our terminology from "effective date" to ""applicable date" based on guidance from the Office of the Federal Register. We also updated citations to reflect the revised regulations that became effective on March 27, 2017."  2017 WL 5180304, at *1.  The Ruling was otherwise unchanged.  *Id.*

great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence."  *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)).

SSR 16-3p rescinded and superseded SSR 96-7p and eliminated "the use of the term 'credibility' from [the SSA's] sub-regulatory policy," because, as the SSA explained, the "regulations do not use this term."  2017 WL 5180304, at *2.  The revised regulations clarify "that subjective symptom evaluation is not an examination of an individual's character."  *Id*. Rather, when determining "whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities . . . the *consistency* of the individual's own statements" is considered.  2017 WL 5180304, at *8 (emphasis added); *see also Banks v. Comm'r of Soc. Sec.*, 2:18-cv-38, 2018 WL 6060449, at *5 (S.D. Ohio Nov. 20, 2018) ("SSR 16-3p requires the ALJ to evaluate the consistency of a plaintiff's statements, without reaching the question of overall credibility, or character for truthfulness.") (citing 2017 WL 5180304, at *11, *report and recommendation adopted*, 2:19-cv-38, 2019 WL 187914 (S.D. Ohio Jan. 14, 2019)).

Notwithstanding this change in terminology, courts in this Circuit have continued to use the term "credibility" when reviewing an ALJ's assessment of a claimant's symptoms and continue to rely on case law using the old terminology.  *See e.g., Alexander*, 2021 WL 4459700, at *14, n. 11; *Young-Roach v. Soc. Sec. Adm.*, 1:20-cv-1853, 2021 WL 4553128, at *10 (N.D. Ohio Oct. 5, 2021); *Banks*, 2018 WL 6060449 at *5.  These cases remain relevant because SSR 16-3p did not change the "two-step process" that an ALJ uses "when assessing the limiting

22

effects of an individual's symptoms[.]" *Martin v. Kijakzi*, 1:20-cv-117, 2021 WL 4066985, at *5

(E.D. Tenn. Sept. 7, 2021); *see also Hoffman v. Comm'r of Soc. Sec.*, 1:20-cv-138, 2021 WL

4145626, at *5 (W.D. Mich. Sept. 13, 2021) (explaining that SSR 16-3p did not change "[t]he

longstanding two-part analysis for evaluating symptoms") (internal citations omitted).  Thus,

when the term "credibility" is used herein, it is used primarily in reference to the standard of

review set forth in governing caselaw, with the understanding that the current standard is more

accurately described as one of "consistency."

To evaluate a claimant's subjective symptoms, an ALJ must consider the claimant's

complaints along with the objective medical evidence, information from medical and non-

medical sources, treatment received, and other evidence.  SSR 16-3p, 2017 WL 5180304, at *5-

8.  The ALJ's decision "must contain specific reasons for the weight given to the individual's

symptoms, be consistent with and supported by the evidence, and be clearly articulated so the

individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's

symptoms."  *Id*. at *10.

 In this case, the ALJ found that the claimant's medically determinable impairments

could reasonably be expected to cause some of the alleged symptoms, but that her "statements

concerning the intensity, persistence and limiting effects of these symptoms are not entirely

consistent with the medical evidence and other evidence in the record."  (Tr. 23.)  She did make

the observation that Ms. Hickerson's treatment for veinous insufficiency "greatly improved her

symptoms," but did not exclusively support this statement with an erroneous evidentiary citation.

Instead, she followed the observation with a detailed discussion of Ms. Hickerson's subjective

complaints, objective findings, and treatments for venous insufficiency from 2017 through 2019,

all supported by accurate citations to evidence in the record.  (Tr. 23.)

23

Specifically, the ALJ referenced medical records from an August 25, 2017 office visit where it was noted that Ms. Hickerson's leg swelling had improved since her vein surgeries, and there were findings of no edema or varicose veins on examination.  (Tr. 23 (citing Tr. 312 (noting Ms. Hickerson "[w]as having some swelling in her legs but says it's improved with the vein surgeries," and noting no edema or varicose veins on examination)).)  The ALJ also identified a significant gap in treatment for venous insufficiency, first referencing Dr. Heffner's statement that he last saw Ms. Hickerson on November 6, 2017, with no further plans for treatment (Tr. 23 (citing Tr. 712)), and then referencing her next treatment visit in March 2019, where examination findings showed no edema and no varicose veins despite a report of bilateral edema in her legs (*Id.* (citing Tr. 793)).   The ALJ also considered Ms. Hickerson's activities of daily living (Tr. 23 ("she is able to cook meals and do dishes. She can do the laundry, clean toilets, and sweep the floor")) and objective test results, including an April 4, 2019 ultrasound that showed no high-grade stenosis in either leg (*Id.* (citing Tr. 1652)).

Ms. Hickerson's argument that the ALJ did not adequately address her subjective symptoms focuses on two treatment visits to establish care with new providers in May 2019, shortly before her disability hearing.  (ECF Doc. 16 pp. 7-8 (citing Tr. 2135-43).)  In the first visit, Ms. Hickerson established care with an orthopedic provider on May 9, 2019, complaining of significant symptoms in her lower extremities that were not relieved by conservative treatment, and reporting only mild brief relief from prior vein procedures.  (Tr. 2141.)  However, the same treatment notes indicate that Ms. Hickerson "has not really sought after any recent treatments."  (Tr. 2141.)  While bilateral swelling of the ankles was noted on physical examination, her back and lower extremity findings were otherwise normal.  (Tr. 2142.)  The

treatment recommendations at that visit were conservative, and included a prescription for tramadol and a course of physical therapy. (Tr. 2142.)

In the second visit, Ms. Hickerson established care at a vein care center on May 14, 2019, with complaints of "aching, being awakened at night, burning, cramping, fatigue, heaviness, itching and swelling in both the right and left lower extremities" and reports that she had "not experienced significant improvement in her symptoms despite the fact of trying . . . various conservative measures." (Tr. 2135.) On physical examination, the edema in her lower extremities was observed to be "moderate," but no varicose or reticular veins were noted in the lower extremities. (Tr. 2137.) The treatment recommendations were for conservative therapy, including: stockings; leg elevation while sitting; avoidance of crossing legs, high heels, or standing/sitting for long periods of time; changing positions to frequently encourage blood flow; and trying to move around at least every 30 minutes. (Tr. 2139.)

As explained above, "there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakely*, 581 F.3d at 406. Ms. Hickerson has not shown that the ALJ's finding that treatment greatly improved her lower extremity symptoms falls outside the ALJ's "zone of choice." A review of the relevant discussion in its entirety reveals that the ALJ took account of Ms. Hickerson's symptoms, considered the consistency of the reported symptoms with the evidence of record, and appropriately resolved conflicts in the evidence. In this context, where the assessment of credibility / consistency is supported by substantial evidence, the identified typographical error is harmless and not a basis for reversal. *See Ulman*, 693 F.3d at 714; *Cameron*, 2016 WL 11431681, at *7; *see also White v. Comm'r of Soc. Sec.*, 970 F.Supp.2d 733, 741 (N.D. Ohio Sept. 10, 2013) (explaining that, "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion

unless there is reason to believe that remand might lead to a different result") (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)).

### (ii)  Apparent Mischaracterization of Hearing Testimony

With respect to the ALJ's statement that "the claimant testified that her problems with walking and standing are not caused by her lower extremity issues" (Tr. 23), Ms. Hickerson correctly argues that her testimony that her back was causing her problems in standing and walking "is <u>not</u> the same" as testifying that her lower extremity issues did not cause problems with standing and walking.  (ECF Doc. 16 p. 9 (emphasis in original).)  She accurately points out that she testified to lower extremity symptoms that led her to wear compression socks and elevate her legs.  (*Id.* (citing Tr. 54).)  As with the above typographical error, the question then becomes whether the ALJ's determination as a whole was supported by substantial evidence, rendering the noted factual error harmless.  *See Ulman*, 693 F.3d at 712-13 (6th Cir. 2012) (noting ALJ's factual mistake was harmless when the ALJ's credibility finding was based on a lengthy analysis of evidence to support the credibility determination).

In this case, a review of the ALJ's decision as a whole reveals that her assessments of Ms. Hickerson's lower extremity impairments and limitations are supported by substantial evidence.  Despite the quoted language, the ALJ found that Ms. Hickerson's severe impairments included bilateral varicose veins status-post ablation and venous insufficiency in the right lower extremity, and explicitly considered the treatment history and medical opinion evidence relating to both conditions.  (Tr. 21, 23-24.)  The ALJ ultimately concluded that Ms. Hickerson could perform a range of light work only if allowed "to elevate her legs to treat her lower extremity edema and provide[d] … a sit/stand option."  (Tr. 23.)  More specifically, she found that Ms. Hickerson could perform light work with "the ability to alternate between sitting and standing, at

her option, every 30 minutes for 1-2 minutes so long as she is not off-task or has to leave the vicinity of the workstation," and so long as also permitted to "occasionally elevate the lower extremities 6 inches throughout the workday." (Tr. 22.) Applying a substantial evidence standard, these limitations are supported by and take into account Ms. Hickerson's history of vein procedures in 2017 (Tr. 774-780), significant gap in related treatment (Tr. 12, 712, 793), and return to treatment shortly before her hearing with complaints of ongoing symptoms, an examination showing moderate edema, and conservative treatment recommendations (Tr. 2139).

The RFC is also consistent with the opinions of the state agency reviewing consultants who opined that Ms. Hickerson could perform a range of light work (Tr. 24, 70-71, 92-94), but with additional lower extremity limitations added by the ALJ in light of the more recent treatment records. The ALJ explained that the state agency opinions:

> are consistent with the claimant's treatment records, which indicate that the claimant experiences bilateral lower extremity edema and mild degenerative disc disease but has normal ejection fraction measurements and underwent successful venous ablations. However, additional evidence received after the state agency examiners' review indicates that the claimant requires the ability to sit and stand at will and to elevate her legs. Accordingly, the undersigned finds these opinions persuasive but has accounted for additional limitations in the residual functional capacity.

(Tr. 24 (emphasis added).)

In these circumstances, the record reflects that the RFC limitations applied by the ALJ are supported by substantial evidence, and within the ALJ's "zone of choice." While the ALJ's characterization of certain hearing testimony is not entirely accurate, a review of the record and decision in its entirety reflects that Ms. Hickerson's lower extremity limitations received full consideration, making the noted misstatement harmless error. *See Ulman*, 693 F.3d at 714; *White*, 970 F.Supp.2d at 741; *Cameron*, 2016 WL 11431681, at *7.

### 2. Whether ALJ Met Her Step Five Burden

Ms. Hickerson also argues that the ALJ erred and failed to carry her Step Five burden when she adopted an RFC requiring occasional elevation of the legs six inches off the ground, despite testimony from Ms. Hickerson that she elevated her legs to heart level five or six times per day.  (ECF Doc. 16 pp. 9-10 (citing Tr. 58).)  In support of this argument, Ms. Hickerson offers a citation to an internet site outside the administrative record for the proposition that "raising the legs above heart level while lying down is a proper treatment for edema."  (*Id.* (emphasis removed); *see* p. 10 n.4.)

As an initial matter, Ms. Hickerson's reliance on information from an internet site outside the administrative record is not appropriate.  The Sixth Circuit has cautioned that reviewing courts must not allow consideration of evidence from outside the administrative record "to change the character of the hearing from one of review to a trial de novo."  *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 839-40 (6th Cir. 2016) (citations omitted) (finding district court erred in considering evidence outside of administrative record as a basis for assigning weight to medical opinion evidence); *see also Stephenson v. Comm'r of Soc. Sec.*, 635 Fed.Appx. 258, 263 (6th Cir. 2015) (upholding RFC due to lack of "any evidence in the record" requiring elevation of legs, regardless of appellant's argument that "the websites Mayoclinic.org and WebMD declare elevation of the limb above the heart to be the standard treatment…").

Here, there is no medical or opinion evidence in the record to support a finding that Ms. Hickerson must elevate her legs to heart level.  When she established care with Dr. Aggarwal shortly before her disability hearing, the conservative treatment recommendations were that Ms. Hickerson elevate her legs while sitting (without any specified height), avoid sitting or standing for prolonged periods, and try to move around at least every thirty minutes.  (Tr. 2139.)  The RFC in this case addresses each of those recommendations, allowing for occasional elevation of

the lower extremities throughout the workday and alternating between sitting and standing at thirty-minute intervals for one to two minutes.  (Tr. 22.)

Ms. Hickerson argues that the ALJ failed to carry her burden at Step Five because the RFC "allowing for arbitrary elevation of only six inches occasionally in a workday is not sufficient to accommodate [her] documented ongoing lower extremity edema."  (ECF Doc. 16 p. 10.)  However, the only evidence in the administrative record that is offered to support the asserted need to elevate her legs higher than six inches is Ms. Hickerson's own testimony that it was her practice to elevate her legs to heart level to help with swelling.  (Tr. 58.)  There is no medical evidence of record indicating that elevation at the height and frequency specified by the ALJ would be insufficient to accommodate her impairments.  As discussed in section VI.B.1(i), *supra*, the ALJ was not required to "accept [Ms. Hickerson's] subjective complaints," *Jones*, 336 F.3d at 476, but is instead expected to consider those complaints in the context of the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence.  SSR 16-3p, 2017 WL 5180304, at *5-8.  As previously explained, the ALJ's analysis was sufficient to support her determinations under a substantial evidence standard.

To the extent that Ms. Hickerson is arguing that her subjective complaints should receive some sort of additional weight at Step Five because the Commissioner bears the burden of proof at that step, she misconstrues the standard.  The Commissioner's burden at Step Five is to prove that there is work available in the economy that Ms. Hickerson could perform.  *See Bowen*, 482 U.S. at 146; *Walters*, 127 F.3d 525.  Here, the VE identified three jobs that could be performed with the limitations set forth in the ALJ's RFC (Tr. 61), and the ALJ found the VE's testimony consistent with the Dictionary of Occupational Titles, and that the relevant jobs existed in significant numbers in the national economy (Tr. 25-26).

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. Hypothetical questions, however, need only incorporate those limitations which the ALJ has accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  As discussed above, the ALJ's findings regarding Ms. Hickerson's RFC limitations and the credibility / consistency of her subjective complaints were supported by substantial evidence.  For the reasons stated, the Commissioner's burden at Step Five has been met under a substantial evidence standard.

To be clear, the limited burden shifting at Step Five does not reverse Ms. Hickerson's initial and ultimate burden to prove disability.  In *Her v. Comm'r of Soc. Sec.*, the Sixth Circuit rejected an argument that the burden to prove the RFC shifts to the Commissioner at Step Five, noting that "[t]he determination of a claimant's Residual Functional Capacity is … based upon the severity of his medical and mental impairments," a determination that is "made at stages one through four, when the claimant is proving the extent of his impairments."  *See* 203 F.3d 388, 391 (6th Cir. 1999); *see also id.* ("it is not unfair to require a claimant to prove the extent of his impairments") (citing *Bowen*, 482 U.S. at 146 n.5 ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so")).

Similar to this case, the plaintiff in *Gillum v. Astrue* argued to the Western District of Kentucky that an RFC allowing leg elevation up to twelve inches but not to waist height was "improper because there was no evidence as to how high [the claimant] needed to elevate her legs." *Gillum v. Astrue*, No. 3:08-cv-252, 2009 WL 1107808, at *2 (W.D. Ky. Apr. 24, 2009).

The court explained that such an argument "overlook[ed] the fact that the disability benefits claimant must always bear the ultimate burden of establishing disability." *Id.* (citing *Key v. Callahan*, 109 F.3d 270 (6th Cir.1997), *Tyra v. Secretary*, 896 F.2d 1024 (6th Cir.1990)).

The analysis must be the same in this case. Ms. Hickerson bore the burden to prove disability and establish her RFC limitations. *See Her*, 203 F.3d at 391. The RFC limitations applied by the ALJ were consistent with the evidence and adequately supported by the decision. Accordingly, and for the reasons set forth in further detail above, the undersigned finds that the RFC is supported by substantial evidence at every step of the analysis. While Ms. Hickerson argues that the evidence supports a more restrictive RFC, it is not this Court's role to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner*, 745 F.2d at 387. Indeed, even if substantial evidence or a preponderance of the evidence were to support Ms. Hickerson's position, reversal is not appropriate where, as is the case here, "substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

### VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

November 3, 2021

/s/ Amanda M. Knapp
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).